# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **AIMEE L. FOX,** | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | 10-4516 |
| **PREMIER IMMEDIATE MEDICAL CARE, LLC,** | : | |
| Defendant. | : | |

**Goldberg, J.**                                                                                                        **December 3, 2012**

## MEMORANDUM OPINION

Plaintiff, Aimee Fox, has sued her former employer, Premier Immediate Medical Care, LLC ("PIMC"), under Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act ("PHRA"). Plaintiff alleges that Defendant subjected her to disparate treatment on the basis of her sex. Plaintiff has also alleged sexual harassment through the creation of a hostile work environment and retaliation. Before the Court is Defendant's motion for summary judgment on the entirety of Plaintiff's claims. For the reasons that follow, we will grant Defendant's motion in part and deny the motion in part.

## I.  FACTUAL AND PROCEDURAL BACKGROUND[1]

Defendant, Premier Immediate Medical Care, LLC (hereinafter "PIMC"), is an acute medical care facility, providing non-surgical, emergency treatment to walk-in patients. Plaintiff worked for

---

[1]The facts that follow are undisputed unless noted otherwise.

1

Defendant as a medical assistant from July 7, 2008 through October 6, 2008, performing both clinical and administrative tasks. Plaintiff alleges that on September 6, 7, and 8, 2008, she was subjected to sexual harassment by Defendant's employee, Dr. Conti, and that as a result of her complaints to members of management, Defendant terminated her employment. (Def.'s State. Facts ¶¶ 1-4; Compl. ¶ 20.)

In support of these claims, and in opposing Defendant's motion for summary judgment, Plaintiff points to her deposition testimony, which reflects that between the dates of September 6 and September 8, 2008, Dr. Conti:

- Stated, in front of a group of people, that it looked like Plaintiff was holding a penis when she was eating a banana (Fox Dep., p. 63);

- Rested his hand on Plaintiff's shoulder numerous times (Id., pp. 64-65);

- Stopped at the front desk where Plaintiff worked several times each day to talk with her (Id., pp. 70, 79, 95);

- Followed Plaintiff into the lunchroom (Id., p. 81);

- "Pulled out [a] packet of [Plaintiff's] pictures" and "started looking through them" without Plaintiff's consent (Id., p. 81);

- Upon looking at Plaintiff's pictures, told Plaintiff "that for one of his hobbies he likes to take pictures of girls" (Id., p. 81);

- Told Plaintiff that she was "very pretty," had a "really nice body" and "really nice legs" (Id., p. 100);

- Followed Plaintiff while she walked to an employee bathroom so closely that he almost bumped into her as she reached the door (Id., pp. 100-03);

- Rubbed Plaintiff's neck without her consent on a day that she had a sore neck (Id., p. 131);

2

- Attempted to give Plaintiff the prescription drug Fioricet² from his own pocket for her sore neck, despite Plaintiff initially refusing because Fioricet had made her feel dizzy and sick to her stomach in the past (Id., p. 132);

- Continued to give Plaintiff additional Fioricet pills and instructed her to take them until he had given her seven pills over a span of five hours (Id., pp. 132-37);

- Asked Plaintiff if she was feeling drowsy and needed to lie down, after she had lied to Dr. Conti and told him that she had taken all of the pills received (Id., pp. 137-38); and

- Told Plaintiff to make a patient chart for herself after giving her the Fioricet so that he could examine her, but told her not to tell anyone he had rubbed her neck or supplied her with the pills because they were his "personal medication" (Id., pp. 137-38).

On the first day of the alleged harassment, September 6, 2008, Dr. Taranth, Medical Director of PIMC, told Plaintiff "to be careful" because Dr. Conti had engaged in similar behavior with another medical assistant, Devon Strobel. (Fox Dep., pp. 60-61.) In conjunction with this evidence and to further support her hostile work environment claim, Plaintiff also points to the testimony of her co-workers, Devon Strobel and Ashley Ducoine, as well as Defendant's Human Resources Director, Melanie Balestra,³ reflecting that over the months of June and July 2008, Dr. Conti:

- Called Strobel "Pinky" because he had seen that she was wearing pink underwear while she bent over to fix a copier (Strobel Dep., pp. 18, 36-38; Ducoine Dep., p. 18; Balestra Dep., p. 17);

- Told Strobel and Ducoine "about a date he was going on" and "how he was

---

² "Fioricet contains a combination of acetaminophen, butalbital and caffeine. . . . Butalbital is in a group of drugs called barbiturates. It relaxes muscle contractions involved in a tension headache." Potential side effects include "drowsiness, dizziness, confusion or lightheadedness." (Def.'s Br., Ex. O, pp. 1-3.)

³ Although Balestra was identified as Defendant's Human Resources Director, she was not involved with interviewing, hiring, and firing, and she indicated that "[she] had no power whatsoever. [She] was just . . . a glorified secretary, really." (Balestra Dep., pp. 9-13.)

3

going to perform oral sex on th[e] woman and [demonstrated] it on an egg roll that he had been eating" (Strobel Dep., p. 18; see also Ducoine Dep., pp. 18, 26);

– Told Strobel that "he did professional private photography and constantly would ask [her] to let him photograph [her]" (Strobel Dep., p. 19; see also Ducoine Dep., p. 19);

– Would continuously follow Strobel around the building (Strobel Dep., p. 19);

– Kept a folder at work of pictures of women he met online, making comments about their breasts (Id., pp. 31-33);

– Insisted on listening to Strobel's chest when she had a minor infection in her toe, "lifted [her] shirt and said, 'oh, hey, nice tattoo'" (Id., pp. 20, 42-43);

– "Made [Strobel] weigh [herself]" while examining her, even though she told him she did not want to be weighed, and then "would tease [her] about [her] weight" (Id., p. 20);

– Told Strobel that she was not allowed to leave the premises for lunch, and that if she did, he would report her to Dr. Silverman, the President and CEO of PIMC (Id., pp. 21-22);

– "Demand[ed] that [Strobel] let him examine [her]" when she had heart palpitations (Id., p. 44);

– Stood outside the door while an EKG was performed on Strobel, continuously knocking on the door and "asking to come in so he could look at it" (Id., pp. 44-48);

– Attempted to look over Ducoine's shoulder to see Strobel in her bra when Ducoine answered the door during the EKG (Id., pp. 48-49; Ducoine Dep., pp. 36-37);

– Threatened to call Dr. Silverman the day after he was kept out of the room during the EKG, saying he would report Strobel for "talking about a[n] [employee] handbook" and being late, although Strobel insisted that she was not late (Strobel Dep., Ex. 1, pp. 2-3); and

– Hugged Strobel without her consent and said "I'm so glad your [sic] finally letting me touch you[,] you smell so good" (Strobel Dep., Ex. 1, p. 3).

4

On September 10, 2008, Plaintiff met with Dr. Taranth and made complaints about Dr. Conti's behavior. (Taranth Dep., pp. 34-35.) On the same date, Plaintiff also emailed a detailed account of Dr. Conti's conduct to Balestra, and Jerri Meijas, the Nursing Manager. (Fox Dep., Ex. D-2; Pl.'s State. Facts ¶ 13.) Several days after Plaintiff's complaint, a meeting was held with Plaintiff, Strobel, Ducoin, Meijas, and Balestra to discuss Dr. Conti's behavior. During this meeting, Plaintiff gave Balestra the Fioricet pills that Dr. Conti had given her on September 8, 2008. (Pl.'s State. Facts ¶ 84.) Balestra described Plaintiff as "one scared kid sitting there." (Balestra Dep., p. 73.)

Following the meeting, Dr. Taranth reviewed the work schedule to ensure that Plaintiff and Dr. Conti would not work together again. (Def.'s State. Facts ¶¶ 120-24.) Balestra gave the Fioricet pills to Dr. Silverman and Jeff Rafsky, Chief Operating Officer for Defendant. Balestra testified at deposition that any time she would ask Dr. Silverman, Rafsky or Meijas about responding to Plaintiff's complaint, she received no response. (Balestra Dep., pp. 30-31, 71.) At the time this occurred, Defendant had no employee handbook and provided no training on discrimination and harassment. (Dep. Hanth, p. 12; Dep. Balestra, p. 8; Dep. Conti, p. 15.)

Dr. Conti testified that he was never informed by Defendant that Plaintiff and Strobel had made complaints of sexual harassment against him. (Dep. Conti, pp. 33-34, 17-18.) Dr. Conti was temporarily removed from Defendant's schedule on September 11, 2008, due to the fact that his medical license had been placed on probation[4] and that he was involved in creating a bomb scare at PIMC. (Silverman Dep., pp. 51-52; Conti Dep., p. 47.) Dr. Silverman allowed Dr. Conti to return

---

[4] Dr. Conti's medical license was placed on probation for the improper prescribing of Percocet and Diazepam to family members, as well as writing prescriptions for Fioricet under his daughter's name, when the pills were for his own personal use. (Conti Dep., Ex. 2.)

5

to work for PIMC on November 28, 2008. (Pl.'s State. Facts ¶ 100.)

Plaintiff's employment was terminated on October 6, 2008. Defendant posits that Plaintiff was terminated not for her complaints about Dr. Conti or her gender, but because she had falsified her timesheets in order to receive extra pay, and that she had a poor work performance. (Def.'s Br. 5, 9.) Defendant's records demonstrate, and Plaintiff agrees, that a "Pre 90-day probation meeting" had been held on August 28, 2008 "to discuss [Plaintiff's] strengths, weaknesses [and] progress to th[at] point." (Def.'s Br., Ex. B, p. 4.) Defendant's records also show that a meeting was held one day later, on August 29, 2008, to "discuss[ ] improper times on timesheet/coming in late/calling out a lot . . . disappears a lot/gossips/complains too much/disrespects mgmt. to other employees." (Id.) Plaintiff denies that this second meeting ever took place, and asserts that she was never warned about any problems with timesheets or about her work performance prior to her termination. (Fox Dep., pp. 178-80.)

After Plaintiff's termination, she worked for the following employers: 1) Any Lab Test Now! in October of 2008; 2) Proserpi-Schlechter Center for Plastic Surgery as a medical assistant from January 2009 through December 2009; and 3) Chili's Restaurant as a waitress from December 2009 through March 2010. Plaintiff was involved in a car accident in September 2010 wherein her car was totaled, and she claims her lack of transportation has impeded her from gaining subsequent employment. She has applied for four positions within walking distance of her home since that time. (Pl.'s State. Facts ¶¶ 137-38, 140-43.)

On September 7, 2010, Plaintiff filed a complaint against her former employer alleging that Defendant had discriminated against her on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et. seq. ("Title VII"), as well as the

Pennsylvania Human Relations Act ("PHRA").[5] Specifically, Plaintiff brings claims of disparate treatment (Count I), as well as sexual harassment creating a hostile work environment and retaliation (Count II). (Compl. ¶¶ 28-29, 32-33, 43-44, 49.) On March 9, 2012, Defendant filed a motion for summary judgment seeking dismissal of each of Plaintiff's claims. The motion is fully briefed and ready for disposition.

## II. STANDARD OF REVIEW

A party moving for summary judgment must show that there are no genuine issues of material fact and that judgment is appropriate as a matter of law. FED. R. CIV. P. 56(a). The moving party bears the initial burden of showing that there are no genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). An issue is "genuine" if a reasonable jury could rule in favor of the non-moving party based on the evidence presented. Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).

The non-moving party cannot avert summary judgment with speculation or conclusory allegations, such as those found in the pleadings, but rather, must present evidence from which a jury could reasonably find in its favor by citing to the record. Ridgewood Bd. of Educ. v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir. 1999); FED. R. CIV. P. 56(c). On a motion for summary judgment, the Court considers the evidence in the light most favorable to the non-moving party. Anderson, 477

---

[5] This Court applies the same analysis to Title VII and PHRA discrimination claims. See e.g., Wilkerson v. New Media Tech. Charter Sch. Inc., 522 F.3d 315, 318-19 (3d Cir. 2008).

U.S. at 256.

## III. DISCUSSION

### A. Plaintiff's Hostile Work Environment Claim

Defendant first challenges Plaintiff's claim that she was subject to a hostile work environment in violation of Title VII. A plaintiff may establish a violation of Title VII by proving that sexual harassment created a "hostile work environment." Huston v. Proctor & Gamble, 568 F.3d 100, 104 (3d. Cir. 2009) (citing Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d. Cir. 1999)).

In order to establish a prima facie case for a hostile work environment, a plaintiff must prove the following: 1) that plaintiff suffered intentional discrimination because of her sex; 2) the discrimination was severe or pervasive; 3) the discrimination detrimentally affected plaintiff; 4) the discrimination would detrimentally affect a reasonable person of the same sex in the same position; and 5) the existence of respondeat superior liability. Huston, 568 F.3d at 104. However, Title VII is not "a general civility code for the American workplace." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80-81 (1998). In evaluating whether a work environment is hostile or abusive, courts must "look[] at all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

Defendant argues that summary judgment is appropriate because Plaintiff cannot establish a hostile work environment through prima facie evidence. Specifically, Defendant urges that the conduct Plaintiff points to: 1) does not rise to the level of severe and pervasive conduct; and 2) does

not trigger respondeat superior liability. Defendant does not challenge Plaintiff's ability to meet the other aspects of a prima facie case, and consequently we will consider those elements conceded for the purposes of this motion.

1. Severe or Pervasive

To satisfy the "severe or pervasive" element of a hostile work environment, Plaintiff must establish that her workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris, 510 U.S. at 21 (citations omitted). Severity and pervasiveness "are alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the work place only if it is pervasive." Jenson v. Potter, 435 F.3d 444, 449 n.3 (3d Cir. 2006) (citations omitted) (overruled in part on other grounds by Burlington N. Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)). The Court may consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. Where harassment is not severe, "incidents of harassment must occur either in concert or with regularity." Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990).

"Incidents involving employees other than [a] plaintiff are also relevant in establishing a generally hostile work environment[,]" provided plaintiff was "aware of the incidents during . . . her term of employment, and that, under the circumstances of the case, there is a nexus between the discrimination directed at him or her, and that directed at others." Velez v. QVC, 227 F. Supp. 2d 384, 410 (E.D. Pa. 2002).

9

Viewed in the light most favorable to Plaintiff, the evidence supports a reasonable inference that Dr. Conti's harassment was sufficiently "severe or pervasive" to alter the conditions of Plaintiff's employment and create a hostile work environment. We recognize that Plaintiff only experienced Dr. Conti's inappropriate comments and touching over a three-day period. However, Plaintiff learned on the first day she worked with Dr. Conti that he had recently engaged in very similar behavior with Strobel. Therefore, under Velez, Dr. Conti's alleged harassment of Strobel may be considered in defining the pervasiveness of the sexual harassment of Plaintiff.

Additionally, if believed, the severity of Dr. Conti's actions on September 8, 2008, wherein he instructed Plaintiff to take seven prescription pills containing barbiturates over a five hour period, and then asking if she would like to lay down in a private room after believing she had taken all of the pills, may indeed rise to the level of "physically threatening." Viewing this allegation in the context of Plaintiff's other complaints of sexual innuendos and unwelcome touching over the prior days, we find that a reasonable jury could find that Plaintiff has satisfied the "severe or pervasive" element of a hostile work environment.

2. Respondeat Superior

Plaintiff must also demonstrate the existence of respondeat superior liability. When the "hostile work environment" is allegedly created by a victim's supervisor, and the "supervisor's harassment culminates in a tangible employment action, such as discharge," an employer is strictly liable for the supervisor's conduct. Faragher v. City of Boca Raton, 524 U.S. 775, 808 (1998); see also Pennsylvania State Police v. Suders, 542 U.S. 129, 129 (2004). When no tangible employment action is taken by the harassing supervisor, an employer may raise an affirmative defense to liability or damages, which they must demonstrate by a preponderance of the evidence. Faragher, 524 U.S.

at 807; see also Agusty-Reyes v. Dept. of Educ. of Puerto Rico, 601 F.3d 45 (1st Cir. 2010) ("[T]he harassing supervisor must be the one who orders the tangible employment action, or at the very least, must be otherwise substantially responsible for the action.") (citations omitted).

The affirmative defense requires that a defendant demonstrate both of the following: 1) "that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and 2) "that the plaintiff employee unreasonably failed to take advantage of any preventative of corrective opportunities provided by the employer to avoid harm or otherwise." Id.

When the harassment is committed by a non-supervisory co-worker, employer liability "exists only if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." Huston v. Proctor & Gamble, 568 F.3d 100, 104 (3d Cir. 2009).

Neither the Supreme Court, nor the Third Circuit have clearly defined the term "supervisor" in the context of a hostile work environment claim. Sofia v. McWilliams, 2003 WL 1818414, at *7 (E.D. Pa. Mar. 31, 2003). In Durham Life Ins. Co. v. Evans, 166 F.3d 139 (3d Cir. 1999), the Third Circuit stated that "complete authority to act on the employer's behalf without the agreement of others is not necessary to meet Title VII's agency standard for supervisor liability." Id. at 154-55 (citing Bonenberger v. Plymouth Township, 132 F.3d 20, 23 (3d Cir. 1997)). Courts in this district have previously applied the guidance provided by the Equal Employment Opportunity Commission ("EEOC"), stating that "[a]n individual qualifies as an employee's 'supervisor' if: a) the individual has authority to undertake or recommend tangible employment decisions affecting the employee; or b) [t]he individual has authority to direct the employee's daily work activities." Sofia, 2003 WL 1818414, at *8 (citing EEOC Enforcement Guidance: Vicarious Employer Liability for Unlawful

Harassment by Supervisors, Following Section 615 of the Compliance Manual; (www.eeoc.gov.docs.harassment.html)).

Defendant disputes Plaintiff's assertion that Dr. Conti was a supervisor, and thus argues that the appropriate test for employer liability should be for harassment by a co-worker. However, both Fox and Ducoine testified that the doctor on duty during a given shift directed and advised the medical assistants in their clinical work, which would qualify as directing daily work activities. (Fox Dep., pp. 13-14, 54; Ducoine Dep., pp. 68-69.) Additionally, according to Strobel's testimony, Dr. Conti threatened to report Strobel to Dr. Silverman and subject her to discipline on two separate occasions. We thus find that Plaintiff has presented sufficient evidence, through her own testimony and that of Ducoine and Strobel, that a reasonable jury could find that Dr. Conti was Plaintiff's supervisor.

Additionally, although Plaintiff has not presented evidence that Dr. Conti was responsible for her termination or any other tangible employment action, Defendant has failed to establish an affirmative defense sufficient to sustain its motion. Under the first prong of the affirmative defense, reasonable care to prevent and correct harassment, Defendant did not have an employee handbook, nor did they educate or train employees on discrimination and harassment during the time period in question in order to prevent harassment. Additionally, the second prong of the affirmative defense, plaintiff's unreasonable failure to take advantage of preventative or corrective opportunities, cannot be met, because Plaintiff took advantage of Defendant's only means of reporting harassment: informing her supervisors and Human Resources Director. Therefore, Plaintiff has raised a reasonable inference that respondeat superior applies, and we cannot find as a matter of law that Defendant has an affirmative defense to liability.

Accordingly, Plaintiff has raised genuine issues of material fact in support of her hostile work environment claim, and Defendant's motion for summary judgment on this count must be denied.

**B.  Plaintiff's Retaliation Claim**

Defendant also contends that Plaintiff has failed to adduce sufficient evidence to support a retaliation claim. To establish a prima facie case of retaliation, a plaintiff must show: 1) protected employee activity; 2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and 3) a causal connection between the employee's protected activity and the employer's adverse action. Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997).

If a plaintiff established a prima facie case, the "familiar McDonnell Douglas approach applies in which 'the burden shifts to the employer to advance a legitimate, non-discriminatory reason' for its conduct and, if it does so, 'the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" Moore v. City of Philadelphia, 461 F.3d 331, 343 (3d Cir. 2006) (quoting Jenson v. Potter, 435 F.3d 444, 449 (3d Cir. 2006)).

1.  Prima Facie Case

We conclude that Plaintiff has adduced sufficient evidence to raise a prima facie case of retaliation. A plaintiff engages in "protected activity" where he or she raises a complaint of discrimination, based upon an objectively reasonable belief that the conduct complained of violated Title VII's standards for unlawful discrimination. Id. Given the nature of the conduct underlying Plaintiff's complaints to her managers and human resources director, a reasonable jury could conclude that she held an objectively reasonable belief that the conduct she complained of violated Title VII.

Plaintiff has also presented sufficient evidence to support a finding that she was subjected to an "adverse action" by Defendant, either shortly after or contemporaneous with her complaints of discrimination. An "adverse action" in this context is conduct that "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). It is undisputed that Plaintiff's employment was terminated less than one month after complaining about Dr. Conti's conduct. Termination clearly meets the definition of "adverse action." Id.

Viewing this evidence in light of the timing of Plaintiff's complaints to Dr. Taranth, Mejias and Balestra, Plaintiff has raised a genuine issue of material fact regarding whether there was a "causal connection" between her complaints of discrimination and her termination. See Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997) (directing that temporal proximity between the plaintiff's protected activity and the adverse action is sufficient to establish a causal connection). Although Defendant argues that the evidence of falsified timesheets breaks the causal chain between Plaintiff's protected activity and the adverse action, as discussed below, a genuine dispute of material fact remains as to whether Plaintiff falsified her timesheets.

    2.  Legitimate, Non-Discriminatory Reason

After finding that Plaintiff has established a prima facie case, Defendant must present a legitimate, non-discriminatory reason for Plaintiff's termination. McDonnell Douglas Corp., 411 U.S. at 802. Defendant contends that Plaintiff was terminated in October 2008 because she had falsified her timesheets on a number of occasions and because her job performance was deficient. Specifically, Defendant relies upon Plaintiff's timesheet covering a two week period, which reflects that in entries for the dates September 14, 19 and 20, 2008, Plaintiff wrote that she worked until

14

10:00 p.m. In conjunction with this timesheet, Defendant points to evidence of nurses who also worked those nights, but whose timesheets show they left work at 9:00 p.m., closing time. (Def.'s Br., Exs. E-H.) Additionally, on September 26, 2008, a twelve hour shift is listed on a date on which Plaintiff was absent. That twelve hour shift is crossed out on the timesheet, and the word "absent" is written next to it. The total numbers of hours listed at the bottom of the page are crossed out as well. (Def.'s Br. Ex. E.) Defendant asserts that this evidence demonstrates that Plaintiff falsified her timesheets on these dates, and thus justifies Plaintiff's firing.

Defendant also argues that Plaintiff was terminated due to issues with her performance. Defendant points to the testimony of Dr. Taranth and Balestra, showing that Plaintiff: 1) painted her nails in front of patients; 2) had numerous loud conversations about inappropriate topics and used inappropriate language in front of patients; 3) was late to work for her first few shifts with PIMC; 4) had substandard clinical skills; 5) walked around the PIMC facility barefoot; and 6) was disrespectful to management. (Def.'s Br., pp. 9-10.)

Given this evidence, we find that Defendant has proffered sufficient evidence of a legitimate, nondiscriminatory reason for Plaintiff's termination.

        3.      <u>Pretext</u>

Because Defendant has proffered a non-discriminatory reason for terminating Plaintiff, she must point to evidence from which a factfinder could reasonably conclude that Defendant's proffered reasons are pretextual. <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763-64 (3d Cir. 1994). This can be accomplished by adducing evidence from which a factfinder could: 1) disbelieve the employer's articulated reasons; or 2) believe that discrimination was more likely than not a motivating or determinative cause of the employer's action. <u>Id.</u> at 764.

Plaintiff strongly denies that she falsified her timesheets, and asserts that she has presented evidence from which a factfinder could disbelieve Defendant's proffered non-discriminatory reasons. First, Plaintiff points out that Jessica Koppel, another employee for Defendant who had never complained of sexual harassment, had falsified her timesheet but was not fired for that conduct. Second, Plaintiff notes that Mejias would not let her compare her own copies of timesheets with those held by the employer on the day she was terminated. Plaintiff also urges that it defies logic that issues with her timesheets were not raised at the meeting on August 28, 2008, wherein her strengths and weaknesses were discussed, but instead that a separate meeting was held the next day, August 29, to discuss timesheets and performance problems. Plaintiff also denies that the August 29, 2008 meeting ever occurred. Additionally, Plaintiff notes that Defendant did not fire her in August, when it allegedly had evidence of her falsifying her timesheets. Plaintiff also stresses that Lynn Hanth a supervisor, verified her hours worked on September 19 and 20, 2008 by initialing next to Plaintiff's hours on those dates, and later verified her initials at her deposition.[6] Lastly, Plaintiff testified that she, not a representative from Defendant, crossed out the twelve hour shift written on her timesheet from September 26, 2008, writing absent next to it, and that she crossed out the totals at the bottom of the page to adjust them down to the appropriate number.

When viewed together, we conclude that Plaintiff has presented sufficient evidence to allow a reasonable jury to find Defendant's timesheets argument to be pretextual.

With regard to Defendant's proffer that Plaintiff was fired for deficient performance, Plaintiff argues that she can establish pretext with evidence that: (1) her performance was never raised at her

---

[6] We note that Lynn Hanth's timesheets from that week indicate that she did not work on September 19 or 20, 2008, an issue also best left for the jury.

termination meeting; and (2) management made numerous complaints about many female staff-members for excessive talking and alleged disrespect for management, and none of these other employees were terminated for such behavior. Therefore, we conclude that Plaintiff has established sufficient evidence that a reasonable juror could find that Defendant's performance argument is pretextual.

Accordingly, Defendant's motion for summary judgment on Plaintiff's retaliation claim will be denied.

### C. Plaintiff's Gender Discrimination Claim

Defendant next contends that Plaintiff has failed to adduce sufficient evidence to support a claim of gender discrimination under the three-step burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), described *supra*.

To establish a prima facie case of disparate treatment discrimination, Plaintiff must demonstrate that she: "(1) is a member of a protected class; (2) was qualified for the position [she] held; (3) was fired from that position; and (4) suffered adverse action under circumstances that give rise to an inference of discrimination." Hobson v. St. Luke's Hosp. & Health Network, 735 F. Supp. 2d 206, 213 (E.D. Pa. 2010).

Defendant contends that Plaintiff has failed to meet the fourth element of her prima facie case because she has not pointed to any other non-female employee who was treated differently. The fourth element of a prima facie case is intended to be flexible enough to fit the circumstances of each type of illegal discrimination. The central focus remains whether the employer is treating some people less favorably than others because of their race, color, religion, sex or national origin. Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 352 (3d Cir. 1999). A plaintiff can satisfy this

element by identifying "a similarly-situated individual outside of the protected class who engaged in the same conduct as plaintiff but was treated more favorabl[y.]" Id. (citing Simpson v. Kay Jewelers, 142 F.3d 639, 646 (3d Cir. 1998)).

We find that Plaintiff has failed to demonstrate that her termination reasonably gives rise to an inference of gender discrimination. Plaintiff has not pointed to any evidence that a similarly-situated male employee was treated preferentially, nor any other evidence to suggest that Defendant terminated her employment because of her gender.[7]

Because Plaintiff has failed to establish a prima facie case of gender discrimination, her claim must be dismissed.

### D. Mitigation of Plaintiff's Damages

Defendant argues that even if Plaintiff is successful in stating her claims, she would be unable to establish that she is entitled to damages because she has failed to mitigate her damages in accordance with Title VII.

Successful Title VII claimants have a duty to mitigate damages.[8] Booker v. Taylor Milk Co., Inc., 64 F.3d 860, 864 (3d Cir. 1995). "Although the statutory duty to mitigate damages is placed on the Title VII plaintiff, the employer has the burden of proving a failure to mitigate." Id. The defendant employer must prove that "1) substantially equivalent work was available, and 2) the Title VII claimant did not exercise reasonable diligence to obtain the employment." Id. Substantially

---

[7]Plaintiff's response to Defendant's motion for summary judgment fails to separately address the disparate treatment claim.

[8]"Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e-5(g)(1).

equivalent employment is employment providing "virtually identical promotional opportunities, job responsibilities, and status as the position from which the Title VII claimant has been discriminatorily terminated." Id. at 866. "The reasonableness of a Title VII claimant's diligence should be viewed in light of the individual characteristics of the claimant and the job market." Id. at 865.

Defendant has failed to provide any evidence that there were substantially similar Medical Assistant positions available to Plaintiff. Additionally, Plaintiff has worked in two medical offices following her termination, as well as in a restaurant waiting tables. After losing her only means of transportation, she has continued to submit applications to places within walking distance. We find Plaintiff's diligence to be sufficient to survive summary judgment as it could demonstrate a willingness and availability for work.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is denied with regard to Plaintiff's hostile work environment claim and retaliation claim, and Defendant's motion is granted with regard to Plaintiff's gender discrimination claim.

Our Order follows.